Filed 3/4/24  P. v. Arguello CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ERIC ARGUELLO,<br><br>Defendant and Appellant. | F085934<br><br>(Super. Ct. No. 1407606)<br><br><br>**OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Stanislaus County.  Nancy A. Leo, Judge.

Elizabeth M. Campbell, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Levy, A.P.J., Poochigian, J. and Smith, J.

## INTRODUCTION

In 2012, appellant and defendant Eric Arguello (appellant Arguello) was convicted after a jury trial of two counts of first degree premeditated murder, two counts of premeditated attempted murder, evading an officer, and active participation in a criminal street gang, with firearm enhancements. In his direct appeal, this court corrected sentencing errors and affirmed his convictions.

In 2019, Arguello filed a petition for resentencing pursuant to former section 1170.95 of the Penal Code;[1] the petition was summarily denied. In 2022, Arguello filed another petition pursuant to amended section 1172.6. In 2023, the trial court denied the petition for failing to state a prima facie case.

On appeal, appellate counsel filed a brief which summarized the facts and procedural history with citations to the record, raised no issues, and asked this court to independently review the record pursuant to both *People v. Delgadillo* (2022) 14 Cal.5th 216 and *People v. Wende* (1979) 25 Cal.3d 436. Arguello filed a letter brief raising two issues, and requested judicial notice[2] of the prosecutor's closing argument at his jury trial. After notice to the parties and without objection, we have taken judicial notice[3] of the entire reporter's transcript from his trial. We review Arguello's contentions and affirm the trial court's denial of his petition.

---

[1]    All further statutory citations are to the Penal Code unless otherwise indicated.

[2]    In his letter brief in this appeal, appellant requested this court take judicial notice of the closing argument from his jury trial; we deferred ruling on appellant's request pending consideration of the appeal on the merits. Thereafter, we advised the parties that we were considering taking judicial notice of the entirety of the reporter's transcript from appellant's trial; the parties did not object. We thus take judicial notice of the entirety of the reporter's transcript, including the instructions, closing arguments, and verdicts.

**FACTS[4]**

"On or about August 31, 2009, Christopher Diaz (age 20) and Mark Ochoa (age 19) were shot to death outside of Diaz's residence in northeast Modesto. The killers also shot at a young man named William Harris, but Harris escaped with his life. The incident occurred around midnight, and several neighbors called 911 after being awakened by the sound of gunfire.

"Officers Larry Meyer and Daniel Phillips of the Modesto Police Department responded to the reports of a shooting. Their dispatcher advised them of a suspect vehicle described as a red Ford F-150 pickup truck. While driving to the crime scene in his marked police cruiser, Officer Meyer spotted a red, four-door, Ford F-150 containing four occupants. He pursued the truck, and Officer Phillips followed in a separate patrol car.

"Officer Meyer got behind the F-150 as it moved eastbound on Floyd Avenue from the intersection with Oakdale Road. The truck accelerated to over 60 miles-per-hour (mph) in a 35 mph zone and ran a stop sign. Officer Meyer activated the lights and siren of his patrol car, but the driver did not pull over. The truck entered a residential neighborhood at Grouse Crossing and made sharp turns at Beacon Hill Lane

---

[4]     The following facts are taken from the nonpublished opinion affirming Arguello's convictions on direct appeal in *People v. Arguello et al.* (Dec. 22, 2016, F069690) (*Arguello et al.*), which the People filed as an exhibit in support of its opposition to Arguello's petition.

In reviewing a section 1172.6 petition, the court may rely on "the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3); *People v. Clements* (2002) 75 Cal.App.5th 276, 292; *People v. Cooper* (2022) 77 Cal.App.5th 393, 406, fn. 9.) The role of the appellate opinion is limited, however, and the court may not rely on factual summaries contained in prior appellate decisions or engage in fact finding at the prima facie stage. (*Clements*, at p. 292; *People v. Lewis* (2021) 11 Cal.5th 952, 972.) We recite the factual statement from the prior appeal to place Arguello's arguments in context, and will not rely on these facts to resolve his appeal from the trial court's order that found his petition did not state a prima facie case for relief.

and Boston Way. As the chase continued down Boston Way, a person seated on the right passenger side of the truck lowered his window and began firing a gun at the pursuing police car. Officer Meyer briefly slowed down and reported over his police radio, 'Shots fired, shots fired, he's shooting at us, shots fired.'

"From Boston Way, the truck turned on Massachusetts Way and then went north on Sunny Park Drive. Officer Meyer caught up with it on Sunny Park Drive as three men were exiting the vehicle. When the patrol car approached them, the person who had stepped out of the right rear passenger door fired more rounds in Officer Meyer's direction. The truck drove away, making a right turn at Suncrest Court, and the three passengers fled on foot.

"After entering Suncrest Court, the F-150 parked in a driveway and turned off its lights. Police found Eric Arguello sitting in the driver's seat and took him into custody. An intensive manhunt for Arguello's passengers ended with the arrests of David Ferrel, Kelly Valle, and Victor Zapien." [¶] … [¶]

At trial, "[k]ey witnesses for the prosecution included victim Diaz's mother, Tamie Cox, and his friend, William Harris. Diaz and Ochoa were killed outside of Ms. Cox's home, which is where Diaz resided, and Ms. Cox was present for some of the events leading up to the shooting. She testified to coming out of her house that evening after hearing Ochoa arguing with someone. She found Ochoa speaking with an agitated and visibly intoxicated person whom she identified in court as defendant Valle. Diaz, Harris, and Arguello were also present during the argument between Valle and Ochoa.

"Ms. Cox saw Valle yelling at Ochoa, declaring himself to be part of 'SPN' and asking '[do] you bang?' She understood this language to be gang jargon. Ochoa identified himself and claimed to be from the 'Deep South Side.' Valle acted skeptical of this response and 'got chest-to-chest' with Ochoa, at which point Ms. Cox intervened and said there would be no fighting on her property. Valle turned to her and said, 'Shut up, bitch,' which further angered Ochoa. Ms. Cox told Valle to leave, and at the subsequent

4.

urging of Arguello, he complied.  Arguello and Valle departed in a red truck.  Ms. Cox went to bed and was later awakened by the sound of gunshots.

"William Harris lived in the same neighborhood as Diaz and had been friends with him for several years.  Harris was also acquainted with Arguello and Ochoa, and testified that both of them were Norteno gang members.  He believed Ochoa belonged to a Norteno subset known as 'South Side Modesto.'  Harris first met Arguello approximately one month prior to the shooting and had socialized with him on a few occasions.  Arguello bragged about being a Norteno and often wore red clothing to signify his membership in the gang.  He also had what Harris referred to as 'Northerner dots' tattooed on his hands.

"Harris, Diaz, and Ochoa were drinking beer with one of Diaz's neighbors on the night of the shooting when Arguello pulled up to Diaz's house in a red Ford F-150 truck.  He was accompanied by Valle, who Harris described as being 'sloppy' drunk and belligerent.  Diaz and Ochoa walked over to speak with Arguello, and Diaz soon began chastising him for bringing such an intoxicated person to his house.  Harris did not hear the entire conversation, but understood Diaz was concerned about getting in trouble with his mother if she discovered a group of drunk people in her driveway.  Shortly thereafter, Tamie Cox came outside to see what was going on.

"According to Harris, Valle looked at Ms. Cox and said, 'What's up bitch,' in a way that seemed like he was hitting on her.  Diaz was offended by the remark and removed his shirt in preparation for a fight.  Arguello was laughing at the situation but tried to be diplomatic, telling Diaz, 'He's drunk, fool, just whatever … [w]e'll leave.'  As they were heading back to the truck, Valle turned his attention to Ochoa and said, 'What's up, fool?  You bang?  You bang?'  Ochoa responded, 'Hell yeah, fool, South Side Modesto, Norte gang.'  Valle replied, 'I ain't never heard of you, fool.  I ain't never seen you.  I'm gonna run your name.  What's your name?'  Ochoa said, 'Sharky, fool, run it.'  Valle pulled out a cell phone, made a call, and appeared to be talking to someone as

5.

he and Arguello were leaving.  Before they drove off, Valle warned that he would be back.

"Arguello and Valle returned later in the evening, this time accompanied by two other people.  Arguello parked a few houses down from Diaz's residence before exiting his vehicle.  Valle got out from the front passenger seat, and two men emerged from the rear doors dressed in black and wearing bandanas to hide their faces.  One of the masked men had a distinctive haircut, which Harris described as a 'Mongolian' look, i.e., a shaved head with a ponytail extending out of a patch of hair in the back.

"Diaz and Ochoa walked into the street anticipating a brawl.  Diaz tapped Harris on the back and said, 'Let's bang on these fools right now.… Let's do this.'  Valle and his masked companions suddenly pulled out guns.  Harris testified that Valle and one of the other gunmen were respectively armed with silver- and dark-colored revolvers, but the man with the Mongolian haircut had a semiautomatic pistol with a 'banana clip,' i.e., an extended or high capacity magazine of ammunition.  Harris explained that he got a close look at the pistol because it was eventually pointed at his head.  Valle aimed his firearm at Ochoa and demanded that Ochoa, Diaz, and Harris all get down on their knees.  The man with the dark-colored revolver held Diaz at gunpoint, while Arguello stood to the side and taunted them, laughing and saying, 'Talk shit now bitches, talk shit now.'

"Harris testified that Valle was the first person to fire his weapon; he shot Ochoa in the chest as Ochoa was backing away from him.  The sound of the blast caused the other people to turn their heads, and Harris used that opportunity to shove the man with the Mongolian haircut and run for his life.  He ran in a zig-zag pattern, hearing a flurry of gunshots behind him.  Harris saw a spark come up from the road as he was running and thus assumed some of the shots were being fired at him.  After reaching an adjacent street, he found a hiding spot and stayed there until the assailants drove away.

"Police found Diaz lying dead in his driveway, shirtless and on his back.  Ochoa's body was located inside the home of one of Diaz's neighbors.  The residents of the house

testified that Ochoa had come bursting through their door in the middle of the night, bleeding from a gunshot wound and holding a semiautomatic handgun. The firearm in Ochoa's possession was identified as a .40-caliber Glock Model 27 (Glock 27) pistol, and had an empty 15-round magazine attached to it.

"Additional firearms were recovered at the location where defendant Ferrel was arrested. Police found him hiding in the backyard of a residence on Hearthstone Lane, positioned approximately 12 to 15 feet away from two handguns: a stainless steel/chrome-colored .357 Smith & Wesson Model 66 revolver and a dark-colored .357 Smith & Wesson Model 27 revolver. The Model 27 contained six spent cartridge casings (i.e., all six rounds in the cylinder had been fired) and the Model 66 contained three live rounds and three spent casings. Investigators also discovered a .40-caliber Glock Model 22 (Glock 22) pistol on the roof of the house. Attached to the Glock 22 was an extended 29-round magazine containing approximately 14 bullets.

"Ferrel was recorded discussing guns during telephone calls made from jail. He expressed concern that police had found two 'heaters,' including 'the black Smith & Wes,' but was fairly confident they had not located 'the other one.' The latter statement was presumably in reference to the Glock 22, since he also remarked that his '.40' was on the roof of someone's house.

"The jailhouse recordings tended to show consciousness of guilt on the part of Ferrel, Valle, and Zapien. During a conversation with his aunt, Zapien said, 'I need a miracle.' He also promised not to flee if she pledged her house as collateral for bail, adding, 'I just need to get out for a little bit before—before it's all bad for me. It might even be all bad for me right now … I fucked up.'

"Autopsy results showed that Ochoa died from a single gunshot wound to the chest. A ballistics expert who analyzed bullet fragments removed from Ochoa's body testified that certain markings were indicative of the bullet having been fired from one of the Smith & Wesson revolvers. Diaz was struck by seven bullets, five of which were

7.

determined to have entered his body from behind. Four bullets, consisting of two different calibers, were recovered at the time of Diaz's autopsy; three were removed from his body and one was found inside of his clothing. The ballistics expert determined that at least two of the bullets removed from Diaz's body were fired from the Model 27 revolver, i.e., the dark-colored one. The expert further opined that the bullet found in Diaz's clothing had most likely been fired from a Glock pistol.

"Investigators recovered several .40-caliber shell casings at or near the first crime scene. Additional .40-caliber casings were found on Boston Way and Sunny Park Drive, and one was discovered in the bed of the Ford F-150 truck. Multiple witnesses explained that revolvers do not automatically eject casings (they remain inside of the cylinder until manually removed), hence the prosecution's theory that these casings came from either Ochoa's Glock 27 or the Glock 22 that was used by one or more of the defendants.

"The prosecution's ballistics expert matched four .40-caliber shell casings found at the first crime scene to Ochoa's Glock 27. A total of eight .40-caliber shell casings were determined to have been fired from the Glock 22, including two casings recovered along Boston Way, one casing recovered on Sunny Park Drive, and the single casing found in the bed of the truck. Another casing was found approximately two houses up from the location where Diaz and Ochoa were killed, in the direction that Harris had run after the shooting began. Based on the location of the latter casing, the prosecution theorized that the man with the Mongolian ponytail had chased Harris and fired at least one shot at him before he escaped.

"The evidence suggested that Diaz and Ochoa were small-time drug dealers, though no direct connection was made between their illicit activities and untimely deaths. Diaz had previously been on friendly terms with Arguello and was apparently acquainted with Zapien to some degree. Text messages retrieved from the parties' cell phones indicated that Zapien had recently contacted Diaz with a proposition to exchange cash, cocaine, or a .9-millimeter handgun for a .45-caliber handgun. Other cell phone evidence

indicated that Zapien was involved in gun trafficking, and that Valle had made contact with him at approximately 11:37 p.m. on the night of the shooting. Before contacting Zapien, Valle placed a series of calls to Rafael 'Turtle' Avina, who was reputed to be a 'shot caller' or leader of the Deep South Side Nortenos.

"Photographs and eyewitness testimony established what the defendants looked like at the time of their arrests. This evidence revealed that Zapien was the person who had been described as having the Mongolian-style haircut. Arguello was shown to have tattoos consisting of a single dot on his right hand, four dots on the knuckles of his left hand, and the letters 'NSH' on his stomach. Valle's appearance was noteworthy because of a large tattoo of the letter 'N' that was shaded in red on the back of his shaved head. Ferrel was arrested wearing an oversized red belt with the number 14 displayed on the buckle, and had tattoos of four dots on his elbow and the numbers 1 and 4 on opposite sides of his arms." (Fn. omitted.)

The prosecution also introduced evidence from an officer who testified as a gang expert. Arguello did not testify.

## PROCEDURAL BACKGROUND

On August 23, 2011, an information was filed in the Superior Court of Stanislaus County charging Arguello and codefendants Kelly Valle, Victor Zapien, Jr., and David Ferrel, Jr., with counts 1 and 2, the premeditated murders of Christopher Diaz and Mark Ochoa (§ 187, subd. (a)), with two special circumstances alleged as to both counts: multiple murder (§ 190.2, subd. (a)(3)) and a gang-related murder (§ 190.2, subd. (a)(22)); and gang (§ 186.22, subd. (b)(1)) and firearm enhancements (§ 12022.53, subds. (d), (e)).

The four defendants were also charged with count 3, premeditated attempted murder of Officer Meyer, a peace officer engaged in the performance of his duties, based on the first incident on Boston, south of Beacon Hill (§§ 664/187, subd. (a)); count 4, premeditated attempted murder of Officer Meyer, based on the second incident at Boston

and Bel Harbor; with gang, firearm, and peace officer (§ 664, subd. (e)) enhancements for both counts. In count 5, they were charged with premeditated attempted murder of Harris, with a firearm enhancement.

In count 6, Arguello was separately charged with vehicular evasion of a peace officer (former Veh. Code, § 2800.2, subd. (a)) with a gang enhancement. Codefendants Valle and Ferrel were separately charged with, respectively, counts 7 and 8, felon in possession of a firearm.

In count 9, the four defendants were charged with active participation in a criminal street gang (§ 186.22, subd. (a)).

**Trial**

On May 7, 2012, a joint jury trial began for the four defendants. A mistrial was declared as to Ferrel because his trial counsel experienced a medical emergency. The trial continued for Arguello and codefendants Valle and Zapien.

**Instructions**

The jury was instructed with CALCRIM No. 401 on direct aiding and abetting, that the People must prove the perpetrator committed the crime; the defendant knew that the perpetrator intended to commit the crime; before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and the defendant's words or conduct did in fact aid the petitioner in committing the crime. "Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

The jury was instructed on the definitions of first and second degree murder, express and implied malice, and premeditation and deliberation (CALCRIM Nos. 520, 521).

The jury was also instructed with CALCRIM No. 600 on the elements of attempted murder, that the defendant took at least one direct but ineffective step toward

10.

killing another person, and the defendant "intended to kill that person;" CALCRIM No. 601 on premeditation and deliberation for attempted murder; and CALCRIM No. 602 on the allegation that he knew or should have known the victim was a peace officer as to counts 3 and 4.

The jury was not instructed on the felony-murder rule, the natural and probable consequences doctrine, or any theory of imputed malice.

## Verdicts

On September 28, 2012, Arguello and codefendants Valle and Zapien were convicted of counts 1 and 2, premeditated first degree murder; the jury found the special circumstances were not true. As to both counts, the jury found true the enhancement pursuant to section 12022.53, subdivisions (d) and (e): that each defendant was a principal in the offense, he violated section 186.22, subdivision (b), and at least one of the principals in the offense personally and intentionally discharged a firearm causing great bodily injury or death.

Arguello and codefendants Valle and Zapien were convicted of count 3, premeditated attempted premeditated murder of Officer Meyer, and count 5, premediated attempted murder of Harris, with section 12022.53, subdivisions (c) and (e) firearm enhancements for both counts. They were also convicted of count 9, active participation in a criminal street gang. Arguello was separately convicted of count 6, evading an officer, with a firearm enhancement.

Arguello and the codefendants were found not guilty of count 4, the additional charge of attempted murder of Officer Meyer. The gang enhancements were found not true for all defendants on all counts.

## Sentencing

On June 11, 2014, Arguello was sentenced to "25 years to life for the premeditated first degree murder of Christopher Diaz, plus 25 years to life for the firearm enhancement; an additional consecutive term of 25 years to life for the premeditated

11.

first degree murder of Mark Ochoa, plus 25 years to life for the firearm enhancement; an additional consecutive term of 15 years to life for the premeditated attempted murder of Officer Meyer, plus 20 years for the firearm enhancement; an additional consecutive term of 15 years to life for the premeditated attempted murder of William Harris, plus 20 years for the firearm enhancement; an additional consecutive term of 2 years for active participation in a criminal street gang; and an additional consecutive term of eight months for felony evasion of a peace officer (one-third of the middle term). With exception of the felony evasion punishment, which was exclusive to Arguello, Zapien received the same sentence." (*Arguello et al.*, *supra*, F069690.)

Arguello's aggregate sentence was 170 years to life plus two years eight months.

**Direct Appeal**

On December 22, 2016, this court filed the nonpublished opinion in *Arguello et al.*, *supra*, F069690, the joint appeal of Arguello and codefendant Zapien; Valle was not a party. We modified Arguello's sentence to stay the determinate term imposed for count 9 pursuant to section 654, corrected errors in the abstract of judgment on counts 3 and 5, and otherwise affirmed the judgment as modified.

As relevant herein, Arguello argued there was insufficient evidence to support his conviction in count 3 for the attempted murder of Officer Meyer during the police chase. Arguello argued Ferrel was the shooter, and there was insufficient evidence Arguello had the intent to kill Officer Meyer. In rejecting this argument, this court noted that "to be guilty of attempted murder as an aider and abettor, a defendant must share the direct perpetrator's intent to kill," and evidence of a defendant's state of mind " ' "is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." ' " (*Arguello et al.*, *supra*, F069690.) "Arguello's presence at the scene was uncontroverted. … Arguello was actually driving the car when the shooting occurred. His continued acts of vehicular evasion during and after the shooting, including his flight once the shooter had exited the vehicle, is probative of whether he

shared the perpetrator's mens rea at the time of the offense. He may not have been well acquainted with the shooter, but the two of them were shown to be fellow Norteno gang members who, according to the jury, had just acted in concert in the commission of two murders and one attempted murder. Instead of immediately disassociating himself from the killers, Arguello served as their getaway driver. He was necessarily aware of the direct perpetrator's willingness to use lethal force, and the consequences of being captured by police provided a strong motive for him to promote, encourage, or instigate the attempt to kill the pursuing officer." (*Arguello et al.*, *supra*, F069690.)

## ARGUELLO'S PETITIONS FOR RESENTENCING

### First Petition

In 2019, Arguello filed a petition for resentencing pursuant to former section 1170.95. At that time, former section 1170.95 was expressly limited to petitions for resentencing on murder convictions.

On June 4, 2019, the trial court filed an order that summarily denied Arguello's petition, apparently without appointing counsel or conducting a hearing. The court's order stated Arguello was convicted of two counts of first degree premeditated murder and two counts of premeditated attempted murder. "His convictions were prosecuted on a theory of premeditation. The District Attorney did not proceed, nor was the jury instructed, on either a theory of felony-murder nor murder under the natural and probable consequences doctrine. … [Former] section 1170.95 … allows persons 'convicted of felony murder or murder under a natural and probable consequences theory' to file a petition for resentencing. … [Former] section 1170.95 makes no provision for persons convicted of premeditated murder to challenge their convictions, even if they were not the actual killer."

13.

**Second Petition**

On April 11, 2022, Arguello filed a second petition for resentencing pursuant to amended section 1172.6 and requested appointment of counsel.[5] He filed a supporting declaration that consisted of a preprinted form where he checked boxes that he was eligible for resentencing because he was convicted of murder, attempted murder, or manslaughter following a trial, and he could not presently be convicted of murder or attempted murder because of changes made to sections 188 and 189, effective January 1, 2019. The court appointed counsel.

**The People's Opposition**

On December 8, 2022, the prosecution filed opposition, with supporting exhibits including the information, the instructions given to the jury on murder and aiding and abetting, verdict forms, and this court's opinion in the direct appeal.

The prosecution argued that Arguello's petition for resentencing of his murder convictions was barred by res judicata and collateral estoppel based on the court's summary denial of his first petition. The People acknowledged that after Arguello's first petition was denied, section 1172.6 was amended to permit a petition for resentencing on his attempted murder convictions. As to both the murder and attempted murder convictions, however, the prosecution argued Arguello's petition lacked merit because he was convicted of committing the offenses with premeditation, malice, and intent to kill. The jury was instructed that it had to find Arguello had the intent to kill if

---

[5] Effective January 1, 2022, Senate Bill No. 775 (2020–2021 Reg. Sess.) (Senate Bill 775) amended former section 1170.95, later renumbered as section 1172.6, and " 'clarifie[d] that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural [and] probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories.' " (*People v. Birdsall* (2022) 77 Cal.App.5th 859, 865, fn. 18; *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 388.) The amended statute also requires the court to appoint counsel if requested by petitioner (§ 1172.6, subd. (b)(3)); and for the court to conduct a hearing on the prima facie issue. (§ 1172.6, subd. (c).)

he was not the actual killer. The jury was not instructed on the felony-murder rule or the natural and probable consequences doctrine.

**Arguello's Reply**

On December 16, 2022, Arguello's counsel filed a reply, and argued Arguello's petition stated a prima facie case and an evidentiary hearing should be held.

**The Trial Court's Denial of the Petition**

On February 24, 2023, the trial court held a hearing on the petition, stated it had reviewed the pleadings and briefs, and invited argument. Arguello's counsel submitted the matter. The prosecutor stated the court should deny resentencing for murder based on collateral estoppel from the denial of Arguello's first petition, and he failed to state a prima facie case for attempted murder because he was convicted based on premeditation and intent to kill.

The court found it had already denied Arguello's first petition for resentencing on his murder convictions, and he was barred from seeking further relief "based on the fact that that had been adjudicated already." As for his attempted murder convictions, the court found Arguello was not convicted based on the felony-murder rule or the natural and probable consequences doctrine.

Arguello filed a timely notice of appeal.

## DISCUSSION

As explained above, appellate counsel filed a brief with this court pursuant to *Wende* and *Delgadillo*. The brief included counsel's declaration that Arguello was advised he could file his own brief with this court. This court also advised Arguello that he could file a supplemental letter brief within 30 days or his appeal would be dismissed. Arguello filed a letter brief and raises two issues about the denial of his petition.

**I. The Record of Conviction, Instructions, and Closing Argument.**

Arguello's first argument is that at the hearing on his section 1172.6 petition, the trial court failed to consider "the [r]ecord of [c]onviction" that included the prosecutor's

15.

closing argument from his jury trial, because the prosecutor "may have imparted a theory in which to 'impute-malice' to … Arguello, that would not have occurred, had [n]ew … § 188 … been in effect in August 2011 (When the Information was Filed)."

In determining whether a petitioner made a prima facie case for relief, the court may review the record of conviction. (*People v. Lewis*, *supra*, 11 Cal.5th at pp. 971−972 & fn. 6.) "A petitioner is ineligible for resentencing as a matter of law if the record of conviction conclusively establishes, with no factfinding, weighing of evidence, or credibility determinations, that (1) the petitioner was the actual killer, or (2) the petitioner was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree, (3) the petitioner was a major participant in the underlying felony and acted with reckless indifference to human life, or (4) the petitioner acted with malice aforethought that was not imputed based solely on participation in a crime." (*People v. Lopez* (2022) 78 Cal.App.5th 1, 13−14.)

The record of conviction includes the jury instructions, closing arguments, and verdicts. (*People v. Lopez*, *supra*, 78 Cal.App.5th at p. 13; *People v. Harden* (2022) 81 Cal.App.5th 45, 56; *People v. Williams* (2022) 86 Cal.App.5th 1244, 1251−1252; *People v. Offley* (2020) 48 Cal.App.5th 588, 599.)

We have reviewed the entirety of the instructions given to the jury at Arguello's trial for the murder and attempted murder charges. The jury was not instructed on the felony-murder rule, the natural and probable consequences doctrine, or any theory of imputed malice. Instead, the jury was instructed on premeditated first degree murder and premeditated attempted murder, and CALCRIM No. 401 on direct aiding and abetting.

"It is well settled that Senate Bill [No.] 1437 [2017–2018 Reg. Sess.] 'does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought.' " (*People v. Williams*, *supra*, 86 Cal.App.5th at p. 1252.) " 'Under a direct aider and abettor liability theory, the

16.

prosecution must prove the person who is not the actual killer "engaged in the requisite acts [actus reus] and had the requisite intent [mens rea]" to aid and abet the target crime of murder.' [Citation.] A direct aider and abettor's 'guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.' " (*Ibid.*)

We have also reviewed the entirety of the closing argument from the prosecutor. She did not rely on any theories of imputed malice when she addressed Arguello's guilt for murder and attempted murder, and instead relied on the direct aiding and abetting instruction. The prosecutor argued that Arguello, and Valle, Zapien, and Ferrel, had a preconceived plan to kill the victims, the murders and attempted murders were premeditated, the gunmen armed themselves, the gunmen acted with the intent to kill, Arguello drove them to and from the various locations with knowledge about and shared their intent, and the defendants were guilty of first degree premeditated murder and premeditated attempted murder.

The prosecutor further argued that Arguello was not a shooter but he was guilty as a direct aider and abettor, and reviewed the instructional definitions—that Arguello was an aider and abettor if he acted with knowledge of the perpetrators' unlawful purpose, and with the intent or purpose of committing, encouraging, or facilitating the commission of a crime, aids, promotes, encourages, or instigates the commission of the crimes; that he did not have to drive the perpetrators to or from the scenes; he made a choice at every step of the way; and the evidence showed he shared their intent to kill, and acted with malice and premeditation.

The trial court correctly denied Arguello's petition for failing to state a prima facie case because he was convicted of two counts of first degree premeditated murder and two counts of premeditated attempted murder as a direct aider and abettor, and he was ineligible for resentencing as a matter of law. The jury was instructed on murder and attempted murder, premeditation, and direct aiding and abetting. The prosecutor relied

17.

on direct aiding and abetting when she argued that Arguello was guilty of the charged offenses, and the jury was not instructed, and the prosecutor did not rely, on the felony-murder rule, the natural and probable consequences doctrine, or any theory of imputed malice.

## II.  *Reyes* **and** *Lopez*

The trial court denied Arguello's petition in February 2023.  In his letter brief in this appeal, Arguello argues his petition for resentencing should be granted based on the "new framework" set forth in *In re Lopez* (2023) 14 Cal.5th 562 (*Lopez*) and *People v. Reyes* (2023) 14 Cal.5th 981 (*Reyes*)—two cases that were decided after his petition was denied.

In *Lopez*, the defendant was convicted after a jury trial of first degree premeditated murder with a gang-murder special circumstance.  The defendant filed a petition for writ of habeas corpus based on *People v. Chiu* (2014) 59 Cal.4th 155, which eliminated the natural and probable consequences theory of aiding and abetting for first degree murder. Defendant argued the jury was improperly instructed on the natural and probable consequences theory; the district attorney asserted any error was harmless based on the special circumstance finding.  The appellate court agreed with the instructional error, but held the error was harmless based on the jury's findings on the special circumstance. *Lopez* disagreed, addressed the harmless error standard of prejudice when a jury is instructed with two theories of an offense, one of which is legally valid and one of which is legally invalid, and remanded the matter.  (*Lopez*, *supra*, 14 Cal.5th at pp. 567−568, 578−579.)

In addressing the defendant's contentions about aiding and abetting, *Lopez* held: "The valid theory of direct aiding and abetting required the jury to find 'that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.'  [Citation.]  ' "When the offense charged is a

18.

specific intent crime, the accomplice must 'share the specific intent of the perpetrator'; this occurs when the accomplice 'knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.' [Citation.]" ' " (*Lopez*, *supra*, 14 Cal.5th at p. 585.) When the charge is attempted murder, " 'the aider and abettor must know and share the murderous intent of the actual perpetrator.' " (*Ibid*.)

*Lopez* does not aid Arguello because, as explained above, the jury herein was not instructed on the natural and probable consequences theory, the jury found the gang-murder special circumstance was not true, and *Lopez*'s harmless error analysis is inapplicable. Moreover, as explained in *Lopez*, the jury was correctly instructed on direct aiding and abetting as the basis for Arguello's convictions for first degree premeditated murder and premeditated attempted murder.

In *Reyes*, the defendant was convicted of second degree murder. The evidence showed he was not the gunman, and the prosecutor relied on the then-applicable natural and probable consequences doctrine. After the amendments to sections 188 and 189, the defendant filed a petition for resentencing and argued he was convicted based on the now-invalid theory of the natural and probable consequences doctrine. The trial court conducted an evidentiary hearing, denied the petition, and found he was guilty beyond a reasonable doubt of second degree murder as a direct perpetrator based on the still-valid theory of implied malice. (*Reyes*, *supra*, 14 Cal.5th at pp. 984, 986−987.)

*Reyes* held that a defendant is liable as a direct aider and abettor of second degree implied malice murder if the defendant, by words or conduct, aids the commission of a life-endangering act, not the act's result. (*Reyes*, *supra*, 14 Cal.5th at p. 991.) The direct aider and abettor must know that the perpetrator intended to commit the act, intend to aid the perpetrator in committing the act, know that the act is dangerous to human life, and act in conscious disregard to human life. (*Ibid*.)

19.

*Reyes*'s discussion of second degree murder, implied malice, aiding and abetting, and causation is inapplicable to the instant case because the instructions show that Arguello was convicted of both first degree premeditated murder and premeditated attempted murder based on his own intent to kill, and not on an alternate theory of implied malice.  (*Reyes*, *supra*, 14 Cal.5th at pp. 989−991.)

## **DISPOSITION**

The trial court's order of February 24, 2023, denying Arguello's petition for failing to state a prima facie case, is affirmed.